# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| AIR LINE PILOTS ASSOCIATION INTERNATIONAL, <br><br> *Plaintiff,* <br><br> v. <br><br> MESA AIRLINES, INC., <br><br> *Defendant.* | Civil Action No. 1:17-cv-236 <br> Hon. Liam O'Grady <br> Hon. Theresa Buchanan |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Mesa Airlines, Inc.'s Motion to Dismiss. (Dkt. No. 10). Plaintiff filed a Complaint in this matter seeking injunctive relief for violations of the Railway Labor Act. Defendant has moved to dismiss the Complaint on all counts alleging that the Court lacks subject matter jurisdiction, and on Count III arguing that Plaintiff failed to state a claim upon which relief may be granted. The matter has been fully briefed and the Court held a hearing on April 21, 2017. For the reasons discussed below, the Court hereby **GRANTS** the Motion.

### I. BACKGROUND

The Air Line Pilots Association, International ("ALPA") is the exclusive collective bargaining representative of the "Mesa Pilots," a group including the Flight Deck Crew Members employed by Mesa Airlines, Inc. ("Mesa") and Mesa Air Group, Inc. ("MAG"). ALPA's role as the exclusive collective bargaining representative for the Mesa Pilots is coordinated by a governing body known as Mesa Air Group Master Executive Council ("MAG MEC").

Defendant Mesa is a regional airline, and a "common carrier by air" within the meaning of the Railway Labor Act ("RLA"). 45 U.S.C. §§ 151–165, 181–88. Plaintiff and Defendant are parties to a Collective Bargaining Agreement ("CBA") that governs the terms and conditions of employment for Mesa Pilots.[1] The parties executed the CBA on December 10, 2008; they resumed negotiations in 2010 and presented a proposed new CBA to the Mesa Pilots in July 2015. The Mesa Pilots rejected it by a vote of 550-86. Dkt. No. 14, at 3. Negotiations resumed in February 2016, and the 2008 CBA remains in effect.[2] *Id.*

The CBA was created in accordance with the RLA, and provides the terms and conditions of employment to "ensure insofar as possible stability among the pilot work force and continuity of the Company's operation." Dkt. No. 11-2, Exh. A. Under § 2 First of the RLA, 45 U.S.C. § 152 First, it is the duty of carriers and employees to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." The CBA includes a Management Rights clause that states, "[e]xcept as expressly restricted by this Agreement, [Mesa] retains all authority and rights to manage and direct its pilot workforce." Dkt. No. 11-2, Exh. A (CBA § 1.F). The Management Rights clause includes a non-exhaustive list of retained rights related to Mesa's authority to manage and direct its workforce, including, in part, "the right to hire; to establish, amend, suspend or revoke rules, policies and procedures; to determine qualifications for initial employment; to establish employee rules of conduct." *Id.*

---

[1] The parties call on the Court to consider the terms of the CBA in deciding the motion. The Court is within its authority to do so. "When determining whether jurisdiction exists, courts must look to the plaintiff's allegations as mere evidence on the issue, and may consider evidence outside the pleadings." *Briley v. United States*, No. 1:16-cv-505, 2016 WL 5402216, at *4 (E.D. Va. Sept. 26, 2016). In considering a Rule 12(b)(6) motion, the Court may likewise consider attachments to the complaint. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012) (stating a court may consider documents attached to the complaint "so long as they are integral to the complaint and authentic.") (citation omitted). While the CBA controls the contractual relationship in dispute, the parties submitted limited excerpts from the actual agreement. Analysis herein related to the CBA is based on these limited excerpts.

[2] Mesa is a wholly owned subsidiary of MAG, a holding company. The current CBA was signed in 2008 on behalf of MAG, but it is binding upon subsidiaries, including Mesa Airlines, per Section 1.A.2 of the agreement.

2

Section 3 of the CBA is entitled "Compensation." Dkt. No. 14-1, Exh. 7. The stated terms are based on hourly flight pay rates, which are determined by both "status (position/equipment) and length of service with the company." Id. at § 3(A). The CBA does not enumerate any compensation other than the hourly rates set forth in Section 3. Additionally, Section 18 of the CBA covers grievances, which are defined as "dispute[s] between the parties arising under the terms of this Agreement." Dkt. No. 15-3, Exh. 1, CBA § 18. Section 18 requires that a grievance be brought within thirty-one days of the alleged violation of the CBA. No formal grievance was filed in this case.

Mesa has implemented several bonus compensation programs in the last decade. Mesa distributed checks amounting to more than $52,500 in the spring of 2007 pursuant to a monthly "Completion Incentive" bonus program. Dkt. No. 11-3, Exh. B. Mesa also implemented a "Perfect Attendance Bonus Initiatives" program in March 2007, which rewarded pilots with perfect attendance and availability during scheduled duty periods. Mesa subsequently modified the program in November 2007 based on pilot feedback. Id. Mesa has also paid more than $1.5 million to date in bonuses under an ongoing performance-related bonus program that began in May 2014. Dkt. No. 11, at 4.

In addition to these programs, Mesa has implemented a number of bonus initiatives since the failed CBA proposal in July 2015. In or about October 2016, Mesa began offering incentive compensation for the first four years of employment as a First Officer with the airline, and posted the schedule for the incentive payments on the company website. A second program, the "Holiday Season Pilot Perfect Attendance Program," began on November 1, 2016, offering employees cash bonuses and options for commuter hotel stays or premiums on vacation benefits. A third program, "The Enhanced Pilot Referral Program," began in November 2016, providing

3

$5,000 referral bonuses to any employee who referred a pilot that completed training. Referring employees would receive an additional $5,000 bonus conditional upon the first, second, and third anniversaries of the date of successful hires through the program. Dkt. No. 1, at 4–5.

On January 15, 2016, MAG MEC Chairman Captain Andy Hughes ("Capt. Hughes") wrote a letter to Mesa Chairman and Chief Executive Officer Jonathan Ornstein ("Ornstein"), expressing concerns about bonus programs that included training-related bonuses for new hires, and requested "the resumption of negotiations on an amended [CBA]." Dkt. No. 14-1, Exh. 2. Mesa continued to carry out the bonus programs, and Capt. Hughes wrote another letter to Ornstein on January 13, 2017. The second letter, which received no response, demanded that Mesa cease and desist implementing new-hire bonuses and the three programs initiated after the 2015 CBA proposal, as well as any other bonus programs. Dkt. No. 1-4, Exh. D. Mesa announced augmented versions of the incentive pay program for First Officers shortly thereafter in both February and March of 2017; the February and March iterations offered up to $10,000 and $22,100, respectively, in annual incentive bonuses. Dkt. No. 14-1, at 6.

Plaintiff filed a three-count Complaint on March 2, 2017, claiming: violation of RLA status quo obligations (Count I), violation of RLA bargaining obligations (Count II), and violation of RLA Organizational Protections (Count III). Dkt. No. 1, at 6–8. The Complaint alleges, *inter alia*, that distribution of bonus compensation modifies the "rates of pay" of Mesa Pilots under the RLA. 45 U.S.C. § 152 First. Defendant timely moved to dismiss Counts I-III for a lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), claiming the dispute to be "minor" and thus subject to mandatory and binding arbitration under the RLA. Defendant additionally asserts that Count III must be dismissed for failure to state a

4

claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 11, at 19. The Court conducted a hearing in this matter on April 21, 2017.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for dismissal of a claim when the court lacks subject matter jurisdiction. In the absence of subject matter jurisdiction, the court must dismiss the action. Fed. R. Civ. P. 12(h)(3). To survive a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden to demonstrate that subject matter jurisdiction exists. *Richmond, F. & P. R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The motion should be granted only if the material facts to determine jurisdiction are not in dispute and the moving party may prevail as a matter of law. *Id.* (citing *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir. 1987)).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. While "detailed factual allegations" are not required, Rule 8 does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. *Id.* Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d

5

462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

### III. DISCUSSION

In its Motion to Dismiss, Defendant argues that its conduct does not constitute grounds for a "major" dispute under the RLA, but rather a "minor" dispute over which the Court lacks jurisdiction. The RLA classifies a dispute as "major" or "minor" with regard to the nature of the dispute. *Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989) ("*Conrail*"). Major disputes may warrant injunctive relief and require that the status quo between parties be preserved throughout the bargaining process, prohibiting the employer from making unilateral changes in working conditions. *See Ry. Labor Executives' Ass'n v. Chesapeake W. Ry.*, 738 F. Supp. 1544, 1549 (E.D. Va. 1990), *aff'd*, 915 F.2d 116, 119 (4th Cir. 1990). Minor disputes, however, are limited to mandatory arbitration proceedings in the interest of continuing commerce, and do not provide grounds for relief in federal district court. *See Conrail*, 491 U.S. at 303.

Defendant submits that CBAs "often incorporate express or implied terms that are designed to give management, or the union, a degree of freedom of action within a specified area of activity." Dkt. No. 11, at 11 (quoting *Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 308 (1989) ("*Conrail*")). Management rights allow not only for the inclusion of bonus compensation within express contractual language, Defendant contends, but also for the claim to implied management rights based on distribution of bonus compensation in past practice. Defendant additionally argues that the Court must dismiss Count III of Plaintiff's complaint for failure to state a claim regarding a violation of the RLA's Organizational Protections.

6

The Court therefore first discusses the statutory framework for distinguishing between major and minor distinctions under the RLA. The Court then addresses Defendant's arguments: (1) to dismiss all counts for lack of jurisdiction on the basis of express management rights; (2) to dismiss all counts for lack of jurisdiction on the basis of implied rights based on past practice; and (3) to dismiss Count III for failure to state a claim.

### A. Major and Minor Disputes Under the RLA

The parties agree that their dispute arises under and is controlled by the RLA. The RLA seeks to establish and govern effective labor agreements that avoid interruptions in commerce. RLA § 2 First; 45 U.S.C. §§ 151a, 152 First. As described above, the RLA distinguishes between "major" and "minor" disputes. In the interest of avoiding major disputes, which require "a lengthy process of bargaining and mediation," there is a strong presumption that disputes arising under the governing CBA between an employer and its unionized employees are minor for purposes of the RLA. *Conrail*, 491 U.S. at 302; *see also United Transp. Union v. Burlington N. R.R. Co.*, 875 F. Supp. 468, 471 (N.D. Ill. 1994) (denying injunctive relief, as it "would not serve the public interest because it would cause interruptions to interstate commerce."); *Int'l Bhd. of Teamsters, Airline Div. v. Horizon Air Indus., Inc.*, No. C17-0121RSL, 2017 WL 1064393, at *4 (W.D. Wash. Mar. 21, 2017) (finding that "the dispute resolution devices Congress adopted and encouraged in 1934 can and should be utilized to expeditiously resolve this 'minor' dispute without resort to the injunctive relief normally reserved for 'major' disputes.").

Minor disputes include those that arise under or grow "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." RLA § 2 Sixth; 45 U.S.C. § 152 Sixth. Indeed, the connection between the dispute

7

and the parties' CBA must only be "arguably justified" to render it minor. *Conrail*, 491 U.S. at 307. If there is reasonable doubt regarding the classification of a dispute, "courts . . . deem a dispute as minor if it even remotely touches on the terms of the relevant collective bargaining agreement." *Bhd. of Maint. of Way Employes Div. v. Burlington Northern Santa Fe Ry. Co.*, 596 F.3d 1217, 1223 (10th Cir. 2010); *see also Dement v. Richmond, F. & P. R. Co.*, 845 F.2d 451, 463 (4th Cir. 1988) ("if a reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor.") (citation omitted).

The statutory bases for major disputes are § 152 Seventh and § 156 of Title 45 of the United States Code, RLA § 2 Seventh and § 6, incorporating "disputes over the formation of collective agreements or efforts to secure them." *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945); *see also United Transp. Union v. Burlington N. R.R. Co.*, 875 F. Supp. at 470 (describing major disputes as "concern[ing] the creation of contractual rights, not enforcement of established rights."). Consequently, a major dispute arises when "the employer's claims are frivolous or obviously insubstantial" based on the existing CBA. *Conrail*, 491 U.S. at 307.

### B. Defendant Asserts Express Rights Within the Management Rights Clause

Defendant claims that the unilateral implementation of bonus programs is within Mesa's express contractual "authority and rights to manage and direct its pilot workforce," per the Management Rights clause. CBA § 1.F. Defendant further submits that the Management Rights clause protects its broad authority "[e]xcept as expressly restricted by this Agreement," and that no restriction exists with respect to bonus compensation. *Id.* The specific compensation terms for hourly rates of pay in Section 3 of the CBA, Defendant continues, do not relate to bonus compensation. *See* Dkt. No. 11, at 17. Specifically, Defendant asserts that bonus compensation is encompassed within its management rights under the CBA, because it is targeted to efforts to

8

recruit and retain pilots as opposed to specifically amending the "rates of pay" based on "status (position/equipment) and length of service with the Company." Dkt. No. 14-1, Exh. 7, § 3.A. In reference to an anticipated shortage of commercial aviation pilots, Defendant explains that there is heightened "competition among regional airlines to attract and retain pilots," and that "[o]ne approach that regional airlines have taken is to pay bonuses to newly-hired pilots." Dkt. No. 11, Exh. 1, at ¶ 15. In light of the competitive landscape and the non-exhaustive list of management rights retained by Mesa, Defendant submits that bonus programs enhance the viability of the airline in terms of strategic management and do not alter the compensation terms in the CBA.

Plaintiff counters that it is entitled to injunctive relief in order to maintain the status quo, as the RLA expressly requires that modifications to "rates of pay" be the subject of collective bargaining. Plaintiff argues that any form of pay to pilots alters their "rates of pay," rendering "Mesa's incentive bonuses [which] effectively double the pay for certain first-year First Officers" a violation of the CBA. Dkt. No. 14, at 10. Plaintiff contends that Mesa's authority under the Management Rights clause "to manage and direct" its workforce does not include the right to alter pay and that the need to recruit and retain pilots does not justify a departure from this conclusion. *See id.* at 12, 2. Rather, Plaintiff asserts, the coverage of Compensation in Section 3 of the CBA sets rates of pay, expressly prohibiting Defendant from implementing bonus programs. *See id.* at 12. Further, Plaintiff claims that several of the bonus programs were implemented shortly after the 2015 CBA tentative agreement was rejected even though ALPA "sought to address them in the negotiations required by the RLA." *Id.* at 2.

Plaintiff contends that this case is analogous to *Int'l Bhd. of Teamsters v. Kalitta Air, LLC*, where a court in the Eastern District of Michigan found a pay dispute between an airline and its pilots to be major, and granted the union injunctive relief. No. 15-13527, 2015 WL

6561715, *6 (Oct. 30, 2015). In *Kalitta*, the union and the airline began collective bargaining in 2011, which included negotiations for an increase in new hire pay. *Id.* at *2. The controlling CBA set newly-hired pilots' pay at "six hundred ($600) per week while in Training," and stipulated that "[a] new hire Crewmember will not receive Flight Pay until he completes [training]." *Id.* The parties had not reached an agreement in 2013 when the airline unilaterally raised the pay for new hires to the "actual flight pay rate of $65.52 per hour," or about $1000 per week. *Id.* The court in *Kalitta* found that the case "plainly involve[d] 'change [to] rates of pay,'" and that raising the pay rate could not "arguably [be] justified by the terms of the parties collective-bargaining agreement." *Id.* at *5 (citations omitted).

Plaintiff argues that Mesa's bonus programs increase the pay of First Officers, and that, as in *Kalitta*, such unilateral increases in new hire pay are grounds for a major dispute under the RLA. Defendant counters that the CBA is silent on bonus compensation, whereas the justification for the pay modification in *Kalitta* "'[ran] headlong into the mandatory language' of the CBA." Dkt. No. 15, at 4 (quoting *Kalitta*, 2015 WL 6561715 at *5).

Plaintiff's argument fails because the bonus programs do not conflict with Section 3 of the CBA governing compensation and because the programs are arguably justified by the Management Rights clause.

Section 3 of the CBA is not specifically addressed by ALPA's January 2016 letter. The letter does not characterize bonus compensation as a change to the "rates of pay," and, deleterious to Plaintiff's argument that bonus compensation is a form of pay, the letter lists "pay, benefits, and work rules" as discrete management areas to be addressed in negotiations over a new CBA. Dkt. No. 14-1, Exh. 2. Because bonuses could be characterized as "benefits" or "pay," and benefits are not governed by the RLA, the Court cannot infer that the letter objected

to the bonuses as modifications to the "rates of pay." *See* 45 U.S.C. § 152 First. Bonuses altering "rates of pay" was only raised in the first instance in the Complaint and even then Plaintiff asks the Court to infer that Defendant's actions conflict with the specifics of the CBA. *See* Dkt. No. 1, at 6–7.

Plaintiff's inability to point to any express contradiction between the bonuses and the Compensation section of the CBA distinguishes this minor dispute from *Kalitta*. Whereas in *Kalitta* the increase in pay to trainees "[ran] headlong" into a provision in those parties' agreement—expressly limiting rates of pay for trainees to $600 per week—there is no comparable provision in the Mesa CBA prohibiting bonuses or classifying all forms of compensation as modifications to pilots' "rates of pay."

Even granting the inference that bonus compensation relates to "rates of pay" insofar as it affects total compensation and may influence a pilot's employment decision, such a connection does not conclusively establish that the objection to the bonus programs fuels a major dispute. On the contrary, "the fact that a permissive subject of bargaining is related to a mandatory subject of bargaining cannot be enough to convert a minor dispute into a major dispute." *Horizon*, 2017 WL 1064393, at *3. Plaintiff would still need to show a conflict between the bonuses and an express term of the CBA. *See Kalitta*, 2015 WL 6561715 at *5; *see also Wheeling & Lake Erie Ry. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, 789 F.3d 681 (6th Cir. 2015) (finding that non-compliance with express contractual language spurred a major dispute in the railroad industry). And even though the bonus programs implemented after the failure to execute a new agreement in July 2015 might have been circumscribed had the new CBA been ratified, this hypothetical similarly does not transform the opposition to the bonuses into a major

dispute. "[U]nilateral changes that touch on any topic that was raised" in negotiations are not per se precluded by the RLA. *Horizon*, 2017 WL 1064393, at *3.

While Section 3 of the CBA does not expressly prohibit bonus programs, those programs are also arguably justified under the Management Rights Clause in two respects. First, any dispute over whether the language within the Management Rights clause permits unilateral implementation of bonus programs presents a question of contract interpretation. Where the Court must engage in interpretation of the terms of the CBA, the dispute is minor. *See Conrail*, 491 U.S. at 305 (finding the labor dispute to be minor where the dispositive question was whether "the terms of an existing agreement either establishe[d] or refute[d] the presence of a right to take the disputed action.") (citation omitted). Second, Plaintiff concedes that the list of enumerated rights is non-exhaustive. Dkt. No. 14, at 12. Thus, Plaintiff's argument that bonus pay contravenes the CBA because it is not expressly mentioned in the Management Rights clause is unconvincing. This is consistent with the Supreme Court's assessment that a collective bargaining agreement is a flexible document, "a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *United Steelworkers of Am. v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 578–79 (1960) (citation omitted).

Further, Defendant's claim that the bonus programs are within management's rights to competitively recruit and retain pilots is not frivolous. *See, e.g., United Transp. Union v. Burlington N. R.R. Co.*, 875 F. Supp. at 469 (finding a minor dispute regarding new hiring and "benefits, including bonuses and relocation expenses" driven by a "severe shortage of locomotive engineers."). Plaintiff acknowledges that management has an interest in recruiting and retaining pilots and that the bonuses are targeted to that effort, but still alleges a violation of "the compensation rules established in the CBA." Dkt. No. 14, at 1; *see also id.* ("Mesa

management began offering a series of employee bonuses directed at what they saw as the most immediate problem: attracting and retaining pilots."). Because recruitment and retention are key facets of workforce management, the Court finds it is arguably justified that efforts to achieve those ends could be within the scope of the Management Rights clause.

For these reasons, Defendant's claim for the inclusion of bonus compensation in express management rights is properly classified as a minor dispute.

### C. Defendant Asserts Implied Rights Based on Past Practice

Defendant also maintains that it has an implied contractual right to offer bonuses. The implied rights are based on past practice "going back at least as far as early 2007," including the distribution of bonus checks and the implementation of a perfect attendance program. Dkt. No. 11-1, Exh. 1, at 4. Defendant further asserts that the recent bonus programs–those established since 2015–were not the subject of a formal objection until the January 13, 2017 letter from Capt. Hughes to Ornstein. Dkt. No. 1-4, Exh. D. According to Defendant, this past practice is more than sufficient to support a claim for Plaintiff's acquiescence to Defendant's implied right to offer bonuses.

Plaintiff denies that evidence of past bonus compensation is enough to establish implied contractual rights. Plaintiff contends that bonus programs were "sporadic, at best, before the barrage of programs beginning in late 2015." Dkt. No. 14, at 14. Plaintiff also submits that, other than Defendant, every ALPA-represented carrier that pays bonuses to its newly-hired pilots has negotiated express terms covering bonus compensation with the union, implying that there is an industry standard that airlines must bargain for the right to implement bonus programs. Dkt. No. 14, at 7.

In rebuttal, Defendant argues that Plaintiff's challenges to the legitimacy of past practice and comparisons to other airlines are factual, if relevant at all, and therefore beyond the scope of the Court's jurisdiction. Dkt. Nos. 11, at 18; 15, at 7. This is because the Court's decision between major and minor simply turns on the nature of the dispute, not the factual findings therein. *See Conrail*, 491 U.S. at 301 ("The question presented by this case is what *kind* of labor dispute we have before us.") (emphasis in original). Defendant submits that every CBA is specific to its parties, that the bargaining of other airlines is irrelevant to this dispute, and that Plaintiff failed to allege whether ALPA's agreements with other airlines were voluntary or mandatory. Dkt. No. 15, at 11 n.6. If the other agreements about bonuses were voluntary, Defendant argues, factual inquiries with respect to those agreements can have no bearing whatsoever on what is mandatory in negotiations between ALPA and Mesa. *Id.*

Defendant's claim to implied management rights is "arguably justified." The employer's burden is "relatively light" to establish grounds for a minor dispute, and the past practice of providing bonuses without formal objection is sufficient for Mesa to state a plausible claim to implied rights. *Conrail*, 491 U.S. at 307. In particular, the "Perfect Attendance Bonus Initiative" program was updated in November 2007 "as a result of [pilots'] feedback." Dkt. No. 11-5, Exh. D. Despite the pilots' direct involvement, there is no indication of any objection by ALPA to the general practice of incentive compensation prior to the letter from Capt. Hughes to Ornstein on January 15, 2016. Dkt. No. 14-1, Exh. 2. Again, considering the non-exhaustive nature of collective bargaining agreements, "[t]here need be no 'meeting of the minds' between the parties" regarding the details of a particular program to be arguably justified by the CBA. *Conrail*, 491 U.S. at 317. Regardless of the contemplation of each party at formation of the

contract, exhibits evincing bonus compensation in past practice render the programs plausibly within Mesa's implied management rights. *See, e.g.*, Dkt. Nos. 11-3, 11-5, 11-6.

In sum, because the bonus programs in dispute could be "arguably justified" within existing contractual rights under the CBA, the dispute is minor for the purposes of the RLA. Determining the relationship between "rates of pay" and the language of the Management Rights clause requires interpretation of the existing CBA, which is enough to remove the inquiry from the Court's jurisdiction. Indeed, Defendant's claims to both express and implied rights are sufficient to establish a lack of jurisdiction in this case.

That this dispute qualifies as minor does not suggest that one party will prevail over the other in the ultimate resolution of the dispute. It may be that "the Union's arguments . . . could carry the day in arbitration." *Conrail*, 491 U.S. at 317. But courts must operate within the RLA's preference for minor disputes, and "the fact that a contract interpretation is questionable, and may be wrong, does not make it frivolous." *Nat'l Ry. Labor Conference v. Int'l Ass'n of Machinists and Aerospace Workers*, 830 F.2d 741, 749 (7th Cir. 1987).

### D. Defendant Moves to Dismiss Count III for Failure to State a Claim

In addition to the jurisdictional challenge, Defendant asserts that Count III, Violation of RLA Organizational Protections, fails to state a claim upon which relief may be granted under Rule 12(b)(6).

To find a violation of RLA Organizational Protections under Count III, Plaintiff must show that Defendant interfered with, undermined, subverted, or destroyed ALPA's status and effectiveness as the collective bargaining representative of the Mesa Pilots. RLA § 2 Third and Fourth; 45 U.S.C. § 152. Because the bargaining representatives are established in this case, there is a heightened requirement to show targeted conduct aimed to destroy the union or the

15

collective bargaining process. *See Trans. World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989) (maintaining that the 1934 amendments to the RLA, including § 2 Third and Fourth, address "primarily the precertification rights and freedoms of unorganized employees."); *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 841 (7th Cir. 1994) ("In situations such as ours, known as 'post-certification' controversies, Section 2, Fourth has been interpreted as providing protection where the plaintiff can show that the employer's actions 'strike a fundamental blow to union or employer activity and the collective bargaining process itself.'") (quoting *Trans World Airlines*, 489 U.S. at 442).

Defendant argues that the bargaining parties are designated in this case, thus the additional burden applies, and Plaintiff must show an "extreme situation[] where the employer's conduct is motivated by anti-union animus, constitutes a fundamental attack on the collective bargaining process, or is a direct attempt to destroy a union." Dkt. No. 11, at 20. Defendant maintains that even without a heightened burden, Plaintiff has not shown any indication of anti-union animus and cannot support a claim for a violation of organizational protections. *Id.* at 19–21. Plaintiff counters that the Complaint includes "myriad examples" of Mesa's repudiation of the CBA and conduct that amounts to a "fundamental attack on the collective bargaining process." Dkt. No. 14, at 17.

Plaintiff does not meet its burden in its claim against Mesa for violation of organizational protections. Plaintiff's assertions that Mesa undermined ALPA's status and effectiveness as a collective bargaining representative are unsupported. Dkt. No. 11, at 20. Additionally, Defendant has shown a willingness to negotiate. Dkt. No. 14-1, Exh. 3 (expressing Defendant's "happ[iness] to 'reengage' in discussions," seeking an "equitable agreement that insures both the company's long term future . . . and the continued the [sic] wellbeing and success of all our

16

people."). Finally, Defendant did not frustrate the success of the July 2015 agreement; rather, the pilots voted to reject the agreement. *See* Dkt. No. 14, at 3. For these reasons, Plaintiff has failed to plausibly allege anti-union animus as motivation for Defendant's unilateral conduct related to bonuses or recruitment, and therefore failed to state a claim under Rule 12(b)(6).

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS that Defendant's Motion to Dismiss is **GRANTED**. (Dkt. No. 10). An appropriate order shall issue.

June 29, 2017
Alexandria, Virginia

Liam O'Grady
United States District Judge